# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-04-00569-CV
---

**Jamie Ross, Appellant**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

---
### FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT
### NO. A-03-0053-CPS, HONORABLE RAE LEIFESTE, JUDGE PRESIDING
---

## M E M O R A N D U M   O P I N I O N

Jamie Adams Ross appeals the district court's order following a bench trial terminating the parental rights to her daughter, T.S.R. In the same proceeding, the district court also terminated the parental rights of T.S.R.'s biological father, Anthony Ross, but he has not appealed the order. In her sole issue on appeal, appellant argues that the evidence was legally and factually insufficient to support the district court's finding that termination of the parent-child relationship was in the best interest of the child. Because we conclude that the record supports the district court's conclusions that appellant engaged in conduct that endangered the child's physical and emotional well-being, and termination is in the child's best interest, we overrule her issue and affirm the trial court's order.

# BACKGROUND

The evidence at trial established the following facts, which are largely undisputed. Appellant and an older male child were already the subject of an intervention by the Texas Department of Family and Protective Services and on a Family Based Safety Service Plan when her daughter, T.S.R., was born on September 29, 2002. Appellant had married Anthony, the baby's father, on February 22, 2002. She had given custody of her son to her mother. When she was four-months' pregnant with T.S.R. and living with Anthony, appellant was assaulted by him, requiring emergency care, admission to the hospital, and surgery to remove bone splinters.

Appellant admitted to using marijuana during her pregnancy, including on the night before she gave birth, and failing to follow her doctor's orders during pregnancy. After she left the hospital following the baby's birth, appellant and T.S.R. resided in a family shelter. She agreed to accept counseling, parenting classes, and domestic abuse education, but had to leave the shelter after thirty days for noncompliance with the shelter's guidelines. She then moved into a residential motel with Anthony.

In late January 2003, appellant and Anthony had a confrontation, and Anthony "kicked" appellant and T.S.R. out of the motel room. Anthony testified that appellant was associating with friends who used drugs and alcohol and who would call the motel room at all hours of the night. He testified that he asked appellant to leave.

After appellant notified the Department that she was living with a friend, the Department lost contact with her. Appellant moved in with another friend on February 11 but was

unable to give the Department her address. She agreed to come into the Department to discuss her case, but she failed to appear.

On February 18, appellant contacted the Department to report that she was staying at the Grande Motel with Anthony. A caseworker for the Department, Bobby Weaver, went to the motel to observe T.S.R. In a report and at trial, Weaver observed that T.S.R. and her clothes smelled of sour milk and that appellant had given T.S.R a bottle of milk that had soured. Appellant told Weaver that she was out of formula and was giving T.S.R. diluted whole milk. The baby had a rash under her chin as well as severe diaper rash. The baby's ear-infection medicine, which required refrigeration, was lying on the floor. During the visit, appellant admitted to drug use and smoking marijuana while in the room with T.S.R. On the same day, T.S.R.'s pediatrician diagnosed and treated her for a severe yeast infection under the chin area and around her diaper area. He also observed that the baby was irritable and crying, presenting behaviors consistent with extreme hunger and with an infant that was not being appropriately fed. The doctor's office provided formula for her to be fed.

Based on the Department's emergency petition that T.S.R.'s health and safety were in immediate danger, on February 18 the Department removed the child from the custody of her parents. T.S.R. was five months old. On February 19, 2003, the Department filed an original petition for protection of T.S.R., for conservatorship, and for termination of the parent-child relationship between T.S.R. and her parents. At a hearing, appellant and Anthony were ordered to pay child support, submit to psychological evaluations and to drug and alcohol assessments, and to attend parenting classes, family and individual counseling, and anger management classes.

3

Appellant entered into a family service plan to achieve family reunification on March 28. By the plan, she agreed to attend parenting classes, attend counseling sessions, participate in drug and alcohol assessments and follow all recommendations, participate in drug and alcohol counseling, maintain housing and apply for HUD housing, complete a series of domestic violence classes, and obtain employment. The trial court ordered appellant to comply with the service plan.

Appellant was scheduled to visit T.S.R. once a week. In the beginning, she visited fairly regularly, approximately three out of four times. Her visits dropped off, however, and there were periods when she did not visit at all. In the summer of 2004, except for a single visit in August, her visits stopped. Appellant would occasionally call to inquire about her daughter after she stopped visiting. After attending a few individual counseling sessions as ordered, appellant failed to complete the requirement and was reported to be under the influence of "something" during one of her sessions. Despite the many opportunities made available to her, she failed to complete drug and domestic violence treatment and counseling, and failed to maintain employment. On February 20, 2004, the district court ordered appellant to participate in inpatient substance abuse treatment, which she failed to do. She did complete the required parenting classes.

Appellant was also unable to maintain stable housing. After living with Anthony for various periods in a house and then at two motels, she moved in with friends for temporary periods of time. She was also in jail for seven outstanding warrants, for approximately three weeks in March and April 2004.

As it became clear that appellant would not comply with the service plan and when appellant failed to participate in drug counseling or inpatient drug treatment, the Department changed

the plan to termination and adoption. At the time of trial in August 2004, T.S.R. was in foster care in the home of Pete and Sandra Gonzales, who indicated an interest in adopting T.S.R. if she became available for adoption. The Gonzaleses filed a petition in intervention. At the conclusion of trial, the court found, by clear and convincing evidence, four grounds for terminating the parent-child relationship under family code section 161.001(1). Specifically, as grounds to support its termination order, the trial court found that appellant: (1) engaged in conduct or knowingly placed T.S.R. with persons who engaged in conduct which endangered her physical or emotional well-being; (2) constructively abandoned the child and has not regularly visited or maintained significant contact with T.S.R., and has demonstrated an inability to provide T.S.R. with a safe environment; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of T.S.R. after she had been in the conservatorship of the Department for not less than nine months as a result of the child's removal from appellant; and (4) used a controlled substance in a manner that endangered the health or safety of the child, and failed to complete a court-ordered substance abuse program. Tex. Fam. Code Ann. § 161.001(1)(E), (N), (O), (P) (West 2002). Pursuant to family code section 161.001(2), the court also found that termination was in T.S.R.'s best interest. *Id*. § 161.001(2) (West 2002).

## ANALYSIS

Appellant urges that the Department failed to sustain its burden to establish by clear and convincing evidence that the evidence is legally and factually sufficient to support the district court's finding that termination was in the child's best interest. Appellant argues that the Department failed to overcome the presumption that termination of the biological mother's parental

5

rights would not be in the best interest of the child.  As an initial matter, she did not ask the district court to appoint her permanent managing conservator.  She concedes that she does not request the return of the child "directly to her care" because she admittedly needs "assistance in caring for herself," but requests only that she retain custody in order to be awarded "whatever visitation the Court feels is appropriate" with the child.

A strong presumption exists that the best interest of the child is served by maintaining the parent-child relationship.  *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).  Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  Tex. Fam. Code Ann. § 161.206(a) (West 2002 & Supp. 2004-05); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).  The clear and convincing standard creates a higher burden to fulfill because of the severity and permanency of terminating the parent-child relationship.  On appeal, then, an appellate court must also have a higher standard when reviewing the legal and factual sufficiency of the evidence.  *Id*. at 264-65; *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

In reviewing the legal sufficiency of the evidence to support a termination finding, this Court looks at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.  *In re J.F.C.,* 96 S.W.3d at 266.  In doing so, we presume that the fact-finder settled disputed facts in favor of the finding if a reasonable fact-finder could do so.  *Id*.  And we disregard all evidence that a reasonable fact-finder could have disbelieved or found incredible.  *Id*.

When reviewing the factual sufficiency of the evidence supporting a termination finding, we inquire as to whether all the evidence, both in support of and contrary to the trial court's finding, is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the allegations. *In re C.H.*, 89 S.W.3d at 27-29. Further, we consider whether the disputed evidence is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*.

Texas courts have long recognized that the natural right existing between a parent and a child is one of constitutional dimensions. *Ex parte Godeke*, 355 S.W.2d 701, 702 n.1 (Tex. 1962). But the "rights of natural parents are not absolute; protection of the child is paramount . . . ." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003).

Section 161.001 of the Texas Family Code permits a court to order termination of parental rights if two elements are established. First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. Tex. Fam. Code Ann. § 161.001(1). Second, termination of the relationship must be in the best interest of the child. *Id*. § 161.001(2). The trial court cited four grounds in ordering termination of appellant's parental rights. Because the record supports the court's findings as to each ground and appellant does not challenge the sufficiency of the evidence to support the court's findings as to these grounds, we turn to whether the termination is in the child's best interest.

In conducting our examination of the sufficiency of the evidence to support the fact-finder's finding that termination is in the child's best interest, we recognize the strong presumption that the child's best interest is served by keeping custody in the natural parent. *Id.* In determining the best interest of the child, a number of factors may be considered, including the following: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parenting abilities of the person seeking custody; (5) programs available to assist those persons in promoting the best interest of the child; (6) plans for the child by those individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The absence of evidence about some of these considerations will not preclude a fact-finder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. But the existence of scant evidence as to each *Holley* factor will not support such a finding. *Id.* Termination should not be used to merely relocate a child to better and more prosperous parents. *In re W.E.C.*, 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.). In a termination suit, our sole focus is the best interest of the child, not the parent. *D.O. v. Texas Dept. of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ).

At trial, appellant agreed that it would not be in the best interest of T.S.R. for her to have physical custody. She testified that she had given her mother possession of her son and had signed a "power of attorney" over to her mother during a time when she was incarcerated. Appellant

8

urged that T.S.R. be placed within her family so that she could exercise visitation in a similar manner.[1] In this manner, she would have "limited influence in the child's life" and termination would therefore not be in the best interest of T.S.R. Appellant claimed that the best interest of the child "would be served by allowing the biological mother to exercise visitation with her daughter while the child continued to reside in a safe environment." Reviewing the evidence as to each factor, we find it legally and factually sufficient to support the finding that termination was in T.S.R.'s best interest.

***Child's Desires***

Because T.S.R. was twenty-three months old at the time of trial, the record does not contain direct evidence of her desires. Nevertheless, T.S.R. has lived in the home of Pete and Sandra Gonzales since April 2003. The record supports the conclusion that she considers them to be her mother and father. Jackie Shacklette, a caseworker with the Department who worked to reunify the Ross family, testified that T.S.R. is very attached to the Gonzaleses and regards them as her mother and father. Although appellant visited T.S.R. "fairly regularly" when she was first placed in foster care, she stopped visiting regularly and T.S.R. became more reserved around her. Appellant was in jail for seven outstanding warrants for approximately three weeks in March and April of 2004 and

---

[1] Although appellant sought a similar arrangement with her mother for her daughter, T.S.R., as that which she had for her son, there was no evidence to support the placement. Appellant also suggested that the court consider placing the child with her mother-in-law, Edna Pauline Ross, or Anthony's sisters. Mrs. Ross testified at trial that she had not intervened in the suit nor sought placement prior to trial, but that she would be willing to care for the child. One of the sisters withdrew her name from consideration. The Department completed a home study on the other sister, but the home study came back negative. No family member filed interventions for custody and, except for Mrs. Ross, they did not testify at trial.

was unable to visit. Although she was scheduled to visit T.S.R. once a week, she visited T.S.R. once in May, not at all in June and July, and then once in August just prior to the termination hearing. Shacklette testified that T.S.R.'s behavior was "appropriate" during her mother's visits, but that she was happy to return to the Gonzaleses following any visits.

***Physical and Emotional Needs of and Danger to the Child***

Appellant contends that the Department presented no evidence of any physical or emotional harm suffered by T.S.R. and that her well-being would not be compromised by appellant's continued visitation. A parent's continued drug use poses an emotional and physical danger to a child. *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). "Without stability, income, or a home, [a parent] is unable to provide for the child's emotional and physical needs;" and a parent's instability "threatens the physical well-being of the child." *Id.* at 894. Establishing a stable, permanent home for the child is a compelling interest of the State. *Edwards v. Texas Dept. of Protective & Regulatory Servs.*, 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997, no writ).

The record reveals ample evidence concerning the needs of the child now and in the future, as well as the danger to the child now and in the future. Lynda Backen, a social worker at Shannon Medical Center, evaluated appellant in April 2002 when she was admitted to the hospital. Appellant, who was four months' pregnant, acknowledged that she was not complying with her doctor's order to be on bed rest, except for four hours a day, and to not lift anything in excess of five pounds. She admitted to smoking marijuana during her pregnancy, and that she had smoked marijuana that day. Backen testified that appellant was not motivated to set goals or change her behavior.

The record contains extensive testimony regarding appellant's drug abuse. As part of her family service plan to achieve family reunification, appellant agreed to participate in drug and alcohol assessments and counseling and to follow all recommendations. She submitted to drug assessment in July 2003, and the assessment recommended that she have inpatient treatment. Jackie Shacklette testified that appellant readily admitted to drug usage, but that appellant would state she could quit using drugs any time she chose. Appellant was taking Loritabs and Ephedra and tested positive for marijuana at T.S.R.'s birth. She was referred to Donna Masterson, a licensed chemical dependency counselor, for substance counseling. Appellant refused to be admitted to an inpatient treatment program. She attended three counseling sessions and then quit going in October 2003. At one drug counseling session on September 24, 2003, appellant admitted that she was using marijuana and would be positive if she was tested. Masterson testified that, at another session, appellant was "very hyper," her "moods were up and down," and she would not stay focused. Masterson sent her for a drug screen, but appellant failed to appear. Masterson testified that based on her assessment and contacts with appellant, "she has a very significant chemical dependency problem." She further testified that, in her professional experience, "a person who says: I can quit any time I want to, generally is saying: I don't want to quit." She stated that she did not believe appellant was honest regarding her drug usage.

Appellant testified that she no longer has a drug problem and that her drug use never endangered T.S.R. She said that she would agree to attend drug therapy if the court did not terminate her parental rights. Both appellant and Shacklette testified that appellant attended and completed parenting classes as required by the family service plan.

11

The evidence is uncontroverted that appellant has not settled into a stable home since the Department took temporary custody of her child, and that appellant is unemployed. Shacklette testified that, from February 2004 to the time of trial, appellant has failed to maintain a permanent residence and that she lives with friends as long as they will let her stay. When one friend kicks her out, she moves to the home of another friend. Appellant testified that she has never been homeless. Appellant has been unemployed for most of the relevant time period. She testified that she worked on an ice cream truck for two weeks, a day labor company for a week, and is generally unable to hold a job.

At trial, appellant acknowledged that she was "not capable and able to take care" of her children, but wanted her mother or mother-in-law to have possession, as with her older son, so that she could participate in their care. She admitted that she needed help in parenting and in caring for herself.

The Department presented evidence that allowing appellant to continue to visit may disrupt T.S.R.'s emotional development, interfere with the bonding between T.S.R. and the Gonzaleses, and be detrimental to the future emotional well-being of T.S.R. Shacklette testified that T.S.R. is at a critical stage in her life when bonding and attachment are known to develop and that long-term foster care is not the same as the permanency provided by adoption. Shacklette also addressed the possibility of visitation by appellant:

> I think because Ms. Ross has not dealt with her substance abuse problem that that
> could pose a continuing problem. I have also observed that at times she has come to
> the office and she has been extremely hyperactive, and her mood swings have been
> very noticeable. She will be very sad one moment, crying; and laughing and joking

12

the next moment.  It almost makes one dizzy to try to interact with her when she's in that state.  And I think that would be detrimental to the child.

### *Parenting Ability, Plans, and Stability of Proposed Placement*

Mr. and Mrs. Gonzales, T.S.R.'s foster parents, both testified at trial.  At the time of trial, T.S.R. was twenty-three months old and had lived in the Gonzaleses' foster home for seventeen of those months.  There is ample evidence that T.S.R. is happy and stable in their home, that she loves and trusts them, and that a psychological attachment exists between them.  Appellant acknowledges that T.S.R. is thriving in her foster home and that her physical and emotional needs are being met.  The Gonzaleses testified to their stability and ability to support T.S.R.  Mr. and Mrs. Gonzales have been married for nineteen years.  Mrs. Gonzales works outside the home and Mr. Gonzales has taken early retirement and does not work outside the home.  Mr. Gonzales takes care of T.S.R. during the day.  They want to adopt T.S.R.  They both testified that T.S.R. has learned to walk, has begun to talk, and is a "real bright little girl."  Mrs. Gonzales's large family has accepted T.S.R. into the family as "one of our own."  They want T.S.R. to have a stable life and to be able to develop without the confusion of foster care.

Paula Moore, an adoption specialist for the Department, testified that it was not in the best interest of a very young child to be in foster care indefinitely and for a parent to continue to have visitation.  Moore testified that she could not think of any advantages for T.S.R. in maintaining her in foster care rather than allowing her to be adopted.  She gave her opinion of what was in the best interest of the child and then testified to the advantages of permanent placement in T.S.R.'s situation:

13

I believe it would be in the child's best interest for the parental rights of both parents to be terminated and the child to be placed in the conservatorship of the Department so that we can place her for adoption.

\* \* \* \*

Adoption is preferred over long-term foster care, because foster care is temporary by nature. Even the most well-intentioned foster parents rarely make it until the child is an adult. And that is because the child is in limbo. And emotionally this is really hard for a child. They don't feel the emotional and legal commitment of a family. They don't have the family's name. They feel different from the biological children. They always have caseworkers and Courts and CASAs and attorneys involved in their lives, and that is not normal and it undermines parental authority. The children's behavior generally escalates, and by adolescence, they're pretty difficult to manage. And most of the time, that's when the foster placements fail.

Based on the evidence, the district court could have concluded that appellant could not, or would not, successfully complete the family service plan she had entered, and that the parental abilities and stability of the individuals seeking custody were clearly established. The district court could have compared the child's projected future with appellant against her projected future with the Gonzaleses and concluded that termination of appellant's parental rights is in T.S.R.'s best interest.

### *Acts or Omissions of Parent and any Excuses*

A parent's long-term drug use and unstable lifestyle is evidence that will support a fact-finder's conclusion that termination is in the child's best interest. A parent's inability to provide a stable home and remain gainfully employed, failure to successfully complete drug treatment, and failure to comply with her court-ordered family service plan supports a finding that termination is in the best interest of the child. *See Holley*, 544 S.W.2d at 372.

14

After examining each *Holley* factor, we conclude that the proof of each factor supports the district court's finding that termination of the parent-child relationship is in T.S.R.'s best interest. Appellant used marijuana and cocaine during her pregnancy with T.S.R. and continued to use drugs in T.S.R.'s presence after she was born, after the Department was involved, and even as T.S.R. was removed. Appellant refused to obtain appropriate treatment or counseling for her drug addiction. She did not comply with her court-ordered family service plan. She did not maintain a job or housing. There was evidence from which the court could conclude that T.S.R. did not receive adequate food or medical care. The district court could reasonably have concluded that appellant committed acts or omissions demonstrating that the parent-child relationship was not a proper one. Moreover, appellant did not offer any excuses for her conduct.

We conclude that the evidence is legally and factually sufficient to support the district court's finding that terminating the parent-child relationship is in T.S.R.'s best interest.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: February 17, 2005

15